418 P.2d 396

**Mary M. Ellis MALANGA, Appellant,**

**v.**

**ROYAL INDEMNITY COMPANY, a foreign corporation, Appellee.**

**No. 2 CA–CIV 135.**

Court of Appeals of Arizona.

Sept. 27, 1966.

Rehearing Denied Oct. 27, 1966.

Judgment Vacated Jan. 18, 1967.

See 101 Ariz. 588, 422 P.2d 704.

2. Amended July 14, 1961, effective on and after midnight October 31, 1961.

. Murphy & Vinson, by John U. Vinson, Tucson,-for appellant.

: Lesher, Scruggs, Rucker, Kimble & Lindamood, by William E. Kimble, Tucson, for appellee.

KRUCKER, Chief Judge.

This is an appeal from a judgment denying recovery in a suit for death benefits under a policy insuring against losses " * * resulting directly and independently of all other causes from accidental bodily injuries * * *."

The insured under the policy was John S. Ellis, who died on March 16, 1963, during the term of the policy, from an over-ingestion of barbiturates and alcohol. His widow, Mary M. Ellis Malanga, was the beneficiary under the policy for death benefits. The death benefits provided for in the policy were in the sum of $30,000 for which an annual premium of $37.50 was charged.

The facts leading up to the death of the deceased, viewed favorably, to support the judgment below, are as follows. The deceased was thirty-two (32) years of age at the time of his death. Excessive use of alcohol had led to marital problems with his wife, the plaintiff below and the appellant here. He separated from his wife in January, 1963, and a divorce case was pending at the time of his death. For approximately two months prior to his death he had abstained from drinking alcohol, but on the evening in question he had been drinking. He had been examined by the family physician nine days before his death and was found to be in excellent health, with the exception of being somewhat weak from dieting and not eating because of worrying about matrimonial problems. On the evening in question, he came to the home of his estranged wife where he collapsed. The family physician was called, the deceased was taken to his own abode and placed in bed, where he was later found dead. In his pockets were two tablets of sodium amytal.

. The family physician testified that he had never prescribed any barbiturates or other drugs for the deceased, that the deceased considered taking medication a sign of weakness, and that as far as the witness knew the deceased had no other attending physician.

Blood tests taken after death indicated the presence of ethyl alcohol and sodium amytal in the bloodstream in such quantities that

neither one alone would ordinarily cause death but in such quantities that together they could have been the cause of the death. Autopsy revealed no traumatic injuries that could have brought about death, and it was the opinion of both the family physician and the pathologist who performed an autopsy that the ingestion of alcohol *and* barbiturates combined were the cause of death.

The pathologist testified in part:

*"Any type of drugs or medication or liquid of this type produces essentially a common factor. The common factor here with any of these agents is central nervous system depression so that you have each one individually acting as a central nervous system depressant.* Now when you take these in various forms or multiple forms, for example with barbiturates, with tranquilizers and so on, you, what we call compound the effect. You not only have the action of the one; you have a total composite action of the many. You can take actually lower doses of any of these agents, *but the cumulative effect is the same as if one massive dose had been taken.*

\*   \*   \*   \*   \*   \*

*"So these agents in large doses are toxic.* This is true of all drugs. The primary site of action is the central nervous system. It is a target organ. It causes a depression of the brain stem. In the brain stem are two important centers, one that controls respiration and one that controls heart rate. This is why we can breathe and our heart will beat automatically. Whether you like it or not, you breathe, your heart beats. These are called automatic. You don't have to think about this to have it happen. Now when you start raising the level of either one of these two agents, these centers which normally have an automatic regulated stimulus, it becomes interfered with so that the stimulation that normally occurs becomes depressed as the level of these agents goes higher and you can eventually completely remove the stimulus by these agents so there is no stimulation to respiration and there would

be no stimulation to heartbeat so that death then occurs by depressing these areas sufficiently so that the heart rate would be slow enough or the respiratory center would be slow enough so that the rate of breathing or the heartbeat rate would not be sufficient to sustain life.

\*   \*   \*   \*   \*   \*

"Q So when we talk about this particular death, we are talking about a man who took enough alcohol and barbiturates into his system as to slow down the function of the central nervous system to a point where his heart stopped beating, is that essentially it, Doctor?

"A Yes. Yes.

"Q Now was this cause of his death, in your opinion, traumatic in nature?

"A No, sir.

"Q There was nothing traumatic that you found in your examination which, in your opinion, contributed to his death?

"A. That's correct.

"Q In your opinion, was his death due to a bodily injury?

"A No, sir.

\*   \*   \*   \*   \*   \*

"Q But the barbiturate and alcohol acting together in the case become poisonous, is that what you are telling us?

"A No, I don't like the term poisonous. I am trying to separate for you, as best I can, poisons from medications. I think I have to because I think this is a big point. We are not talking about poisons here. This is a prescribed type medicine. Alcohol is prescribed as a medicine and it is good in a specific amount, so I can't use the word poison for this type of agent because over here I have poisons that we see every day in town that in and by themselves, when ingested, produce toxic effects and may produce death. These do not produce toxic or poisonous effects. It is more or less a depression that results from internal cellular changes. I can't answer this is a poisonous change. We don't see this cellular change in the laboratory. It is something **that** we theorize must occur." (Emphasis added.)

**153**

Pertinent provisions of the policy in question are as follows:

"This insurance is against loss indicated as covered in the Schedule of Benefits resulting directly and independently of all other causes from accidental bodily injuries sustained during the term of the policy, herein referred to as such injury, subject to all the provisions, exceptions, limitations and reductions of the policy.

\* \* \* \* \* \*

"Part II    Death Benefit

"If within ninety days *after the date of accident,* if the Insured is not continuously totally disabled, or within two hundred weeks after the date of accident and during a period of continuous total disability for which weekly indemnity shall have been payable under Part I of this policy, *such injury* shall result in Insured's loss of life, the Company will pay the amount specified in the Schedule of Benefits." (Emphasis added.)

The appellant contends that these facts establish conclusively that there is coverage under the subject policy. She argues that while the ingestion of the alcohol and the barbiturates may have been intentional, the result induced by such ingestion, death, was unintentional and, therefore, the death was the result of " \* \* \* accidental bodily injuries sustained during the term of the policy \* \* \*."

■ It is, of course, hornbook law that an insurance policy will be construed, if ambiguous, contrary to the interests of the insurance company which selected the verbiage in the policy. D.M.A.F.B. Federal Credit Union v. Employers Mut. L. Ins. Co. of Wis., 96 Ariz. 399, 396 P.2d 20 (1964); 44 C.J.S. Insurance § 297c; 29 Am.Jur., Insurance, § 258. Appellant contends that if the appellee had intended to exclude death from the ingestion of alcohol and barbiturates it could have easily excluded such a death, and not having done so, this policy is at least ambiguous as to whether it covers the death in question.

■ We believe that an insurance policy should be given that meaning which its wording conveys to the ordinary person conversant with the standard meanings of the English language. Droz v. Paul Revere Life Insurance Co., 1 Ariz.App. 581, 405 P.2d 833 (1965); 44 C.J.S. Insurance § 294; 29 Am.Jur., Insurance, §§ 247 and 252. When words are given such a meaning, and lack of coverage is the result, we do not believe that the language should be tortured to create an ambiguity which, in turn, under the above rule of construction, would result in the opposite of what was so expressed. D.M.A.F.B. Federal Credit Union v. Employers Mut. L. Ins. Co. of Wis., supra; 44 C.J.S. Insurance § 296; 29 Am.Jur., Insurance, § 246; Automobile Ins. Co. of Hartford, Conn. v. Denny, 206 F.2d 401, 40 A.L.R.2d 865 (8th Cir. 1953), cert. denied 346 U.S. 898, 74 S.Ct. 223, 98 L.Ed. 399.

■ Giving the language at hand its ordinary meaning, and construing all of the language of the policy together, as is proper, Droz v. Paul Revere Life Insurance Co., supra; 44 C.J.S. Insurance § 298; 29 Am. Jur., Insurance, § 250, we hold that the trial court was justified in denying recovery under this policy.

■ We believe the following to be the correct statement of applicable law:

"If the insured acts with the intention of causing harm to himself, or a similar harm to befall, or if he acts with knowledge that his act may cause harm, the consequent harm is not an accident. So, accident is never present when a deliberate act is performed unless some additional, unexpected, independent, and unforeseen happening occurs which produces or brings about the result of injury or death." Couch on Insurance 2d, § 41:14, pp. 34–35.

Also:

"Generally, death or injury does not result from accident or accidental means within the meaning of a provision where it is the result of the injured's voluntary act, unaccompanied by anything entirely unusual, unexpected, and unforeseen ex-

cept the death or injury—in other words, where the means are voluntarily employed in the usual and expected way, the resulting injury or death is not produced by accident or by accidental means, even though it is unusual or unforeseen." Couch on Insurance 2d, § 41:15, pp. 35–36.

The cases appear to be unanimous in holding that when death results from over-ingestion of alcohol, if there is no mistake involved in the drinking thereof, the death is not the result of an accident. Naggy v. Provident Life & Accident Ins. Co., 218 Iowa 694, 255 N.W. 526 (1934); Powley v. Equitable Life Assur. Soc., 157 App.Div. 324, 12 N.Y.S.2d 864 (1939), aff'd, 284 N.Y. 664, 30 N.E.2d 607 (1940).

In dictum, Gay v. Pacific Mutual Life Insurance Company, 237 F.2d 448 (5th Cir. 1956), indicates that an overdose of alcohol and barbiturates would not be an accidental death. The case of Morgan v. Indemnity Ins. Co. of North America, 302 N.Y. 435, 99 N.E.2d 228 (1951), appears to hold that if death results from an overdose of *both* alcohol and barbiturates, for whatever reason taken, death would not be the result of an accident, but that if death results solely from an overdose of barbiturates it "may" be considered accidental.

There being no findings of fact and conclusions of law by the trial court, it is our duty to uphold the decision below if there be any theory justified by the evidence (construed most favorably to support the judgment) which will uphold the trial court. Mountain States Construction Company v. Riley, 88 Ariz. 335, 356 P.2d 648 (1960).

The plaintiff had the burden of proving that death was the result of accidental bodily injuries. 46 C.J.S. Insurance § 1317b(2) (a) 29A Am.Jur., Insurance, § 1852; New York Life Ins. Co. v. Greber, 55 Ariz. 261, 100 P.2d 987 (1940); and see Carnes v. Iowa State Traveling Men's Ass'n, 106 Iowa 281, 76 N.W. 683 (1898), for a case involving death resulting from an overdose of drugs. That the barbiturates in question may have been taken for other than medicinal purposes, as the alcohol in question admittedly was, is a conclusion left open to the trier of fact under the proof in this case.

The subject policy could have provided for hospital benefits, and if because of taking alcohol and barbiturates the insured had needed to be hospitalized to recover, few people would contend under the proof before this court as to the effects of these two agencies that the hospitalization was the result of " * * * accidental bodily injuries * * *." That the depressing effects of the drug and alcohol ingested went so far as to cause death would not seem to change the coverage of this policy under applicable authority.

We have previously emphasized in the quotations from the subject policy that portion providing:

"If within ninety days after the date of accident, * * * such injury shall result in Insured's loss of life * * *."

This seems to clearly indicate that the loss of life itself is not contemplated as being something that in itself can be regarded as an accident. The clear meaning of these words is that there must be some preceding accidental event which is the cause of the loss of life. Here we have no such accidental preceding event.

The appellant argues that death resulted from "intercellular changes," which the pathologist postulated must have preceded the death of the deceased. Counsel for defendant (appellee herein) brought out on examination that similar intercellular changes occur when death results from pneumonia. If such intercellular changes may be regarded as the "accident" resulting in the deceased's death, then most deaths are the result of " * * * accidental bodily injuries * * *" for death is seldom intended, but is often the result of acts intentionally done.

There are a considerable number of cases holding that when death results from an overdose of drugs, recovery may be had under an accident policy. Many of these cases will be found in an annotation begin-

ning at 52 A.L.R.2d 1083. A reading of cases allowing recovery will indicate that in each there was evidence from which the trier of fact might have found that the drug was being taken for medicinal purposes, and that any harmful effect was the result of mistake or inadvertence.

We believe the true rule that can be gained from these many cases is as stated in the annotation above cited:

> "The conclusion to be drawn, both in jurisdictions accepting and jurisdictions rejecting the distinction in question,[1] is that whether death or injury resulting from the insured's voluntary act in taking an overdose of medicine, drugs, or the like will be regarded as produced by 'accidental means' depends upon the particular facts and circumstances shown." 52 A.L.R.2d 1083, 1087

Judgment affirmed.

HATHAWAY and MOLLOY, JJ., concur.

1. The "distinction" referred to here is the distinction made by some courts between death caused by "accidental means" and "accidental death." We have not indulged in this discussion because we do not believe that the distinction has any pertinency to the subject policy, which refers neither to "accidental means" nor to "accidental death."